**In re TACOMA BOATBUILDING COMPANY, Debtor.**

**CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, individually and as agent for the Bank of California, N.A.; and Canadian Imperial Bank of Commerce; the Bank of California, N.A.; and Canadian Imperial Bank of Commerce, Plaintiffs,**

**v.**

**TACOMA BOATBUILDING COMPANY, debtor, At–Sea Incineration; the United States of America, represented by the Secretary of Transportation by and through the Maritime Administration; and the National Bank of Washington, Indenture Trustee, Defendants.**

**Bankruptcy No. 85 B 11535 (BRL).**
**Adv. No. 85–6704A(BRL).**

United States Bankruptcy Court, S.D. New York.

Dec. 31, 1987.

---

Fried, Frank, Harris, Shriver & Jacobson by Matthew Gluck, New York City, for plaintiffs.

Dept. of Justice—Civ. Div. by Diane L. Donley, Asst. Atty. Gen., Washington, D.C., for U.S. representing the Secretary of Transp.

Levin & Weintraub & Crames by Lester Kirshenbaum, Wilkie, Farr & Gallagher by Gerald Kerner, New York City, for debtor.

D'Amato & Lynch by Robert Meshel, New York City, for third-party defendant Hill, Betts & Nash.

Hart & Hume by Lewis Stockman, New York City, for third-party defendant Indus. Indem. Co.

Booth, Marcus & Pierce by Marc E. Richards, New York City, for Official Creditors' Committee.

## DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Chief Judge.

### I. INTRODUCTION

On September 23, 1985, Tacoma Boatbuilding Company ("Tacoma" or "debtor") a Washington based manufacturer of high technology, high performance vessels, filed a petition for reorganization under Chapter 11 of Title 11 of the United States Code (the "Code"). In accordance with §§ 1107 and 1108 of the Code, Tacoma continued to manage its business and property

as debtor in possession. On August 17, 1987 an order was entered confirming Tacoma's First Amended and Restated Plan of Reorganization (the "Plan")[1].

This adversary proceeding was commenced on November 1, 1985 by the filing of a complaint (the "Complaint") by plaintiffs Continental Illinois National Bank and Trust Company of Chicago ("Continental") the Bank of California, N.A., and Canadian Imperial Bank of Commerce (collectively the "Banks"). The Complaint sought, *inter alia:* (1) a declaration that the Banks' security interest in the Apollo One and Apollo Two incineration ships (the "Vessels") under construction by Tacoma, primed the security interests of At–Sea Incineration, Inc. ("ASI"), and its successor, the United States Secretary of Transportation, acting through the Maritime Administration ("Marad"); and (2) an injunction prohibiting Tacoma, ASI, or Marad from taking any action to obtain a Certificate of Documentation for the Apollo Two or to obtain a preferred maritime lien on either of the Vessels[2].

In February 1987, the Banks moved for summary judgment pursuant to Fed.R.Civ. P. Rule 56, made applicable here by force of Rule 7056 of the Fed.R.Bankr.P. Marad, in turn, belatedly cross-moved for summary judgment seeking a determination that as a buyer in the ordinary course of business within the meaning of Section 1–201 of the Uniform Commercial Code ("UCC"), Marad's interest primed the Banks' security interest in accordance with UCC § 9–307.

## II. JURISDICTION

This adversary proceeding requires a determination as to the priority of competing liens on the debtor's property. Pursuant to 28 U.S.C. § 157(b)(1), (b)(2)(K) and (O), such a controversy is explicitly recognized as a core proceeding within the reach of a bankruptcy court's jurisdiction. Thus, this Court has the power to hear and rule on the issues raised in the Complaint.

## III. FACTS

### A. THE BANKS' SECURITY INTEREST

On September 8, 1980, the Banks and Tacoma entered into a Term Loan Agreement (the "Term Loan") through which the Banks initially agreed to loan $6,000,000 to Tacoma for general financing. The Banks, in turn, were granted a security interest pursuant to a September 17, 1980 Security Agreement[3] ("1980 Security Agreement"), in substantially all of Tacoma's assets, including inventory (and work in process)[4], accounts receivable, equipment, real estate,

---

1. Notwithstanding confirmation of the Plan, this court retains jurisdiction over this adversary proceeding pursuant to Article XII of the Plan which provides that "The Bankruptcy Court shall retain jurisdiction of this chapter 11 case pursuant to and for the purpose of §§ 105(a) and 1127 of the Code and for, *inter alia,* the following purposes: (g) to determine all applications, adversary proceedings and litigated matters pending on the Confirmation Date."

The outcome of this litigation will have no affect on the consummation of the debtor's confirmed plan. Indeed, after initially casting a ballot rejecting the Plan and filing an objection to the Plan, Marad withdrew its objection and changed its vote to an acceptance.

2. Paragraph 12. of the Complaint contained the following allegation: *"Documentation of Apollo One.* On or about April 12, 1985, at the request of ASI, the United States Coast Guard issued a Certificate of Documentation … for Apollo One. Under 46 *U.S.C.* §§ 911 *et seq.,* issuance of

this Certificate of Documentation makes possible the filing of a preferred maritime lien against Apollo One, which could take a position superior to that of the Banks' already perfected senior lien. Upon information and belief, TBC and ASI will attempt to obtain a Certificate of Documentation for Apollo Two in the near future."

After the commencement of this case, the parties stipulated that the debtor would not transfer the Vessels without adequate notice to the Banks. See transcript of August 21, 1987 hearing at 9–10.

3. Section 8 of the Term Loan also delineated the scope of the Banks' collateral package.

4. Paragraph 1 of the Security Agreement defines Inventory as follows: "Inventory" shall mean all goods held by the Company for sale or lease, or furnished or to be furnished by the Company under any contract of service, or held by the Company as raw materials, work in process or materials used or consumed in a business.

contract rights, general intangibles and the proceeds of the foregoing.

The 1980 Security Agreement authorized Tacoma to sell inventory in the ordinary course of business, as follows:

4. *Processing, Sale, Collection, etc.* Until such time as the [Banks'] shall notify [Tacoma] of the revocation of such power and authority [Tacoma] (a) may, in the ordinary course of its business, at its own expense, sell, lease or furnish under contracts of service any of the Inventory normally held by the Company for such purpose and use and consume in the ordinary course of its business, any raw materials, work in process or materials normally held by [Tacoma] for such purpose,....

On September 18, 1980, the Banks' perfected their security interest by filing a UCC–1 financing statement, number 80263000, with the Washington State Department of Licensing.[5] The Banks' financing statement described their collateral as follows:

All of the following, whether now or hereafter existing or acquired, all machinery and equipment of the Debtor of every kind and description (including without limitation, all machinery and equipment of the kind described in Schedule A hereto); all inventory of the Debtor; all accounts receivable, contract rights and general intangibles of the Debtor, and all other rights of the Debtor to payment; all chattel paper and instruments evidencing any obligation to Debtor for payment for goods sold or leased or services rendered; all interest of Debtor in any goods, the sale or lease of which shall have given rise to, and in all guarantees and other property securing the payment of or performance under, an accounts receivable, contract rights, or any such chattel paper or instruments; and all proceeds of any of the foregoing.

Thereafter, Tacoma and the Banks entered into a series of amendments to the initial loan agreements which resulted in Tacoma receiving enhanced financing (including the issuance of letters of credit) aggregating, as of the Chapter 11 filing, in excess of $32 million. On June 24, 1985, in accordance with UCC §§ 9–403(2) and (3),[6] the Banks continued the perfection of that security interest by filing a UCC–3 continuation statement, number 85–175–0703, with the Washington Department of Licensing. Thus, the aggregate indebtedness was subject to the Banks' continuously perfected security interest.

## B. THE APOLLO CONTRACTS

On December 29, 1981, more then one year after the Banks perfected their security interest, Tacoma contracted with Apollo Company, L.P. ("Apollo") to construct and sell two ocean-going vessels designed for at sea incineration of toxic wastes, the Apollo One and Two. The Vessels were to be the first of their type *built* in the United States. At that time two such vessels operated outside the United States but they were *converted* for use as toxic waste incinerators. The price of each Apollo vessel was $31,630,000.

The Apollo contracts are virtually identical except that one refers to hull number 433 ("Apollo One") and the second to hull number 434 ("Apollo Two"). The contracts provide, *inter alia*, for Tacoma to maintain title to the Vessels during construction. In the construction period, Apollo was to make progress payments to Tacoma. To secure Tacoma's performance under the contracts, Apollo was granted a security

---

5. The parties agree that no choice of law question is involved because the Uniform Commercial Code for all states whose law could conceivably apply in this case (Washington, Illinois and New York) are the same. *See,* Banks' Memorandum of Law in Support of Summary Judgment Motion at p. 4; Marad's Memorandum of Law in Support of Cross–Motion for Summary Judgment at p. 11.

6. *UCC § 9–403(2) provides in relevant part* "Except as provided in subsection (6) a filed financing statement is effective for a period of five years from the date of filing."

UCC § 9–403(3) provides in relevant part "A continuation statement may be filed by the secured party within six months prior to expiration of the five year period specified in subsection (2)."

interest in the Vessels.[7] The Apollo contracts specified that delivery would take place after completion of construction and compliance with and approval of all laws, regulations, and requirements of the American Bureau of Shipping and of all governmental agencies with jurisdiction over the construction, use and certification of such vessels.[8] To date, the Vessels have not been completed and *a fortiori* have not received the required approvals.

It was not until October 20, 1982 that Apollo perfected its security interest by filing a UCC–1 financing statement, number 82–294–0017, with the Washington Department of Licensing.

On October 20, 1982, Industrial Indemnity Company ("IIC"), as surety, entered into two Performance and Payment Bonds, agreeing to indemnify Apollo against any failure by Tacoma to construct the Vessels and produce them free and clear of liens.

## C. MARAD'S FINANCING

On October 26, 1982, Apollo issued United States guaranteed ship financing bonds in the aggregate amount of $59,875,000 (the "Bonds") to raise a portion of the Vessels' construction cost.[9] The Bonds were issued with the National Bank of Washington serving as indenture trustee (the "Indenture Trustee").

On that same day, Apollo entered into an authorization agreement and guarantee commitment with Marad (the "Guarantee") under which Marad, pursuant to Title XI of the Merchant Marine Act of 1936, as amended, 46 U.S.C. § 1271, *et seq.*, guaranteed the Bonds. As security for Marad's guarantee, Apollo issued a promissory note to Marad in the principal amount of $59,-875,000. In addition, Marad and Apollo entered into a Security Agreement dated as of October 26, 1982, granting Marad a security interest in Apollo's interest in the Vessels and the Apollo contracts [10].

In connection with this transaction, Apollo's counsel, Hill, Betts & Nash ("HBN"), issued an opinion letter dated October 26, 1982 (the "Opinion Letter") which stated, *inter alia:*

> As to questions of fact material to the opinions expressed herein, we have, when relevant facts were not independently established, relied upon certificates or affidavits by officers of the Shipowner and others.... We have made such examination as we deem necessary as a basis for the opinions hereinafter expressed. Based upon the foregoing we advise you that in our opinion:
> ...
> 13. To the best of our knowledge, there are outstanding no security agreements under the Uniform Commercial Code of any State of the United States with respect to any of the Vessels (other than the Uniform Commercial Code Filing No. 82–294–0017 in the State of Washington which has been assigned to the Secretary) or in respect of any of the agreements entered into or to be entered

---

**7.** Article XXV of the Apollo contracts provides, in pertinent part, "Title to the vessel shall vest in [Tacoma] during construction. [Tacoma] grants to [Apollo] a security interest in the Vessel (or so much as has been built or to which [Tacoma] has title) and in all parts, components, materials, supplies, equipment, apparatus and other items of whatsoever nature and in [Tacoma's] interest in any contracts for provision of any such items to be used on, in or in connection with the Vessel as are in its actual or constructive possession and to which [Apollo] does not have title, in order to secure performance of all obligations of [Tacoma] to [Apollo] under this Contract.

**8.** Article I(b) of the Apollo contracts provides, in pertinent part "The Vessel shall be constructed at Contractor's shipyard (hereafter called the "Shipyard") at Tacoma, Washington. When the

Contract work on the Vessel has passed the tests required by this Contract, the Vessel shall be delivered by contractor and accepted by Purchaser ...

**9.** As a result of the funding agreements between Marad and Apollo, Apollo provided the remainder of the cost of the Vessels in the amount of $19,125,000 and $7,623,062 in working capital.

**10.** The Marad Security Agreement granted Marad a security interest in the following: I. The Construction Contracts, together with all other contracts whether now in existence or hereinafter entered into relating to the Construction of the Apollo Vessels....II. [Apollo's] rights to receive all moneys which from time to time become due to the Shipowner, in respect of the Construction of the Vessels ...

into or referred herein under the laws of any jurisdiction except in favor of the Secretary.

Attached to the Opinion Letter was a verified statement by Tacoma's President that he did not know of the existence of any other security interest in the Vessels superior to Apollo's.[11]

On October 20, 1982, Apollo filed a UCC–3 Statement of Continuation, Termination and Assignment, number 82–294–0018, with the Washington Department of Licensing, assigning all of Apollo's interest in the Vessels to Marad. As noted above, the Banks' UCC–1, evidencing the Banks' lien on virtually all of Tacoma's assets, had been filed there nearly *two years earlier.*

### D. ASSIGNMENT OF APOLLO CONTRACTS TO ASI

On January 18, 1985, Apollo assigned the Apollo contracts to ASI. Seventy percent of ASI's common stock is owned by Tacoma, with the remainder owned by Apollo. The assignment provided that ASI's rights in the Apollo contracts were subject to MarAd's security interest.

### E. SUBSEQUENT EVENTS

The Apollo contracts, as revised, provided that the Apollo One was to be delivered to ASI by March 31, 1985 and the Apollo Two by December 31, 1985. As is wont in most construction projects, delays and substantial cost overruns were experienced. In addition, Tacoma was generally experiencing cash flow problems. Negotiations ensued amongst Tacoma, ASI and Marad for delivery of the Apollo One to take place on September 21, 1985. However, on September 19, 1985, the Banks, in accordance with the Term Loan and the 1980 Security Agreement, issued a letter to Tacoma revoking Tacoma's authority to sell any of its property, including the Vessels. At that time, the Apollo One was approximately ninety-five percent complete and the Apollo

Two was approximately seventy percent complete. In September 1985, Tacoma ceased all work on the Vessels and, to date, both remain at Tacoma's shipyard[12].

On November 18, 1985, upon receipt of demand for payment under the Guaranty, Marad paid $59,390,000. in principal and $4,389,891. in accrued interest to the Indenture Trustee.

## IV. PROCEDURAL HISTORY

While the aforesaid recitation contains the factual underpinnings of the somewhat complex transaction at the base of this proceeding, to appreciate the outcome, a detailed description of its tortured procedural history is also warranted.

On November 1, 1985, the Banks commenced this adversary proceeding with the filing of the Complaint. On January 7, 1986, Marad filed its answer (the "Answer"), denying the superiority of the Banks' lien, and raising *only* two defenses: (i) the bankruptcy court's want of subject matter jurisdiction, and (ii) the complaint failed to state a claim.

Thereafter, until April 14, 1986 when Marad filed a third party complaint against the surety, IIC, no substantive action is reflected on the legal docket and neither party initiated discovery.

The IIC third-party complaint alleged, in essence, IIC'S breach of its surety obligations to ASI, entitled its successor, Marad, to (i) injunctive relief requiring the completion of the Vessels, and (ii) indemnification for damages suffered should it be determined the Banks' lien is superior to ASI's lien in the Vessels.

The next substantive action was taken when Marad filed a May 16, 1986 third-party complaint against ASI's attorneys, HBN, seeking damages flowing from what is alleged to have been the negligent preparation of the Opinion Letter.

---

11. In addition, in connection with the assignment of Apollo's interest in the contracts to Marad, Marad obtained a Consent of Shipbuilder from Tacoma containing a certification that "the Vessels were free and clear of any and all liens."

12. It has been estimated that it would cost in excess of $2 million to complete Apollo One and approximately $20 million to complete the Apollo Two.

In this period the parties focused their attention on the third-party complaints and IIC's motion to be dismissed as a third-party defendant. Thus, on August 21, 1986, this Court heard and denied IIC's motion to dismiss the Complaint. Of importance here, however, is the fact that the key players to this adversary proceeding were in court and participated in this hearing, which also served as a pre-trial status conference.

In the course of this hearing, in response to inquiries as to the future of the adversary proceeding, the Banks set forth their view that because the issues were purely legal they were prepared to move for summary judgment forthwith, conditioned only upon the debtor filing a motion pursuant to Section 365 of the Code to reject the Apollo contracts. No one quarreled with the Banks' view or stated a contrary position.

At the conclusion of this hearing, the debtor's counsel represented he would be filing the rejection motion shortly[13]. He also reiterated the debtor's view that the determination of the dispute between the Banks and Marad was "Crucial to the confirmation of this case" and urged that "Pre-trial discovery would proceed expeditiously so we don't have to do a 502(c) sort of exercise ..."[14]

On September 29, 1986, the debtor filed its motion seeking authority to reject the Apollo contracts pursuant to Section 365 of the Code. As dictated by statute and controlling case law, the debtor demonstrated

that the contracts were burdensome inasmuch as continued performance would precipitate enormous financial loss[15], and that rejection would benefit the estate and creditors. On November 3, 1986, an Order was entered authorizing the rejection of the Apollo contracts (the "Rejection Order"). Marad did not oppose this motion.

In addition, on October 31, 1986, the debtor filed a motion seeking approval of a September 26, 1986 agreement encompassing a global settlement of the debtor's disputes with the Banks (the "Letter Agreement"), including those emanating from this adversary proceeding[16]. Of relevance here is that portion which provided that, (assuming it were determined in this adversary proceeding that the Banks had a first lien on the Vessels) the Banks and the debtor would enter into a joint venture for the operation and completion of the Vessels, with the Banks to receive a 70% interest and the debtor a 30% interest.

On November 20, 1986, Marad filed a three page objection to this motion. In the fourth paragraph, amidst a series of exceptions pitched towards the disposition of the Vessels outlined in the Letter Agreement, Marad, for the first time raised as a challenge to the *Letter Agreement* ASI's alleged status as a "buyer in the ordinary course of business", as follows:

4. With respect to the Apollo vessels, Continental and TBC ignore At–Sea Incineration's (ASI), now Marad's, superior interests in these vessels. MARAD is a

---

13. See transcript of August 21, 1986 hearing at 7, 36.

14. Transcript of August 21, 1986 hearing at 45. Section 502(c) of the Code requires the estimation of a creditors' claim when the actual liquidation of the claim would unduly delay administration of a case. The classification and amount of Marad's claim against the debtor and the contours of the debtor's Plan were integrally related to the outcome of this litigation.

Ultimately, the debtor did propose and confirm a Plan fashioned to await the outcome of this litigation. See fn. 1.

15. The debtor's moving papers demonstrated that continued performance under the Apollo contracts would result in a $14.5 million loss. At the November 3, 1986 hearing on this motion, the following offer of proof was made: the Apollo One was 95% complete. ASI had paid

$35,727,000 under this contract and $445,000 remained outstanding. It was estimated it would cost in excess of $2.5 million to complete Apollo One. The Apollo Two was 70% complete. ASI paid $31,815,685 and $5.6 million remained outstanding. It was estimated it would cost in excess of $20 million to complete Apollo Two. Tr. at 5.

16. The Letter Agreement also treated the following assets claimed as part of the Banks' collateral: (a) Contract with the Royal Thai Navy for the construction of two surveillance vessels and the associated payment account; (b) the debtor's shipyard along the Tacoma waterfront, together with buildings and equipment; (c) cash collateral account established at the Bank of California.

buyer in the ordinary course of business in the Apollo vessels, having spent over $59 million and thus takes free of any security interest created by TBC. Hence, Continental and TBC should not be permitted to make a court-sanctioned disposition of MARAD's property, albeit tentative.

Marad appeared and pursued its objection at the November 24 hearing. However, "buyer in the ordinary course" was not raised in its presentation. On December 1, 1986 an order was entered approving the terms of the Letter Agreement.

Thus, while Marad was obviously aware of a possible "buyer in the ordinary course" defense as early as 1986, it did not raise that defense in the context of *this adversary proceeding* until March 1987, after the Banks' summary judgment motion was filed. And, as will be explained in detail, the tactics Marad pursued in raising this defense are most aptly described as dilatory legal manoeuvering in flagrant disregard of the rules promulgated to insure the orderly unfolding of litigation in the federal courts.

## V. MARAD IN WONDERLAND (MARAD'S MANEUVERINGS)

In mid-January, 1987, fourteen months after this case was commenced and five months after the Banks advised the parties and the court that they were prepared to move for summary judgment, Marad noticed Continental's deposition. And, one month later, after the Banks' filed their summary judgment motion, Marad noticed the debtor's deposition. According to Marad, its belated initiation of discovery was related to an investigation into the validity of the Banks' security interest in the Vessels. Suffice it to say Marad offered no explanation as to why it did not deem discovery necessary in the course of the preceeding year [17].

On February 11, the Banks filed their summary judgment motion seeking a determination that the Banks' lien on Tacoma's inventory and virtually all of Tacoma's assets takes priority over the liens of ASI (and Marad) in the Vessels. This motion was accompanied by an affidavit, a Statement of Material Facts as required by Rule 13(h) of the Local Bankruptcy Rules for this District [18], a voluminous binder of documents evidencing and supporting the Banks' lien, and a Memorandum of Law. This motion was scheduled for argument on March 19, more than one month later.

In response, on March 10, Marad filed a motion pursuant to F.R.Civ.P. Rule 56(e) and Bankruptcy Rule 7056, styled Notice of Motion For Continuance Or Other Relief When Affidavits Or Other Discovery Is Unavailable, also returnable on March 19. This motion sought an open-ended adjournment of the hearing on the Banks' summary judgment motion to enable Marad to complete depositions and obtain documents relating to the validity of Marad's lien.[19]

17. In a March 9, 1987 affidavit, Marad's counsel sought to explain the sudden initiation of discovery as based upon the unattributed statement of a former Tacoma officer, as follows, "2. On information and belief I learned in January 1987 from a former [Tacoma] officer that Continental may not have a security interest in the two incineration vessels, Hull 433 and Hull 434 . . . which [Tacoma] was constructing for [Apollo] . . ."

18. Rule 13(h) governs summary judgment motions as follows: "On any motion for summary judgment pursuant to Bankruptcy Rule 7056, there shall be annexed to the notice of motion a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion.

The papers opposing a summary judgment motion shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party."

19. Marad's Notice of Motion listed the following depositions:
(i) examination of the former Chairman of Tacoma's Board to "examine his understanding of the security interest which was granted to Tacoma and whether that security interest was intended to cover the Apollo Vessels; (ii) examination of a former Continental employee "likely to know the scope or intended scope of Continental's security interest in the Apollo Vessels".

Marad's papers were bereft of both an explanation as to why discovery had not been initiated in the preceding fourteen months and of any basis to support the conclusion that such discovery would further this litigation, which, until then, had been framed in the pleadings as a dispute concerning the priority of competing liens, based upon the documents annexed to the Banks' summary judgment motion and other publicly filed documents.

By the March 19 return date, Marad failed to (a) respond to the merits of the pending summary judgment motion; (b) respond to the Banks' 13(h) Statement; or (c) file its own 13(h) Statement. Instead, Marad pressed for an adjournment. Marad also advised the parties *it had that morning filed* a cross-motion for summary judgment based upon its theory that, as ASI's successor, Marad was a "buyer in the ordinary course", and entitled to the Vessels free of the Banks' lien as a matter of law. However, prompted by the Court's surprise at hearing this theory for the first time in the fifteen month pendency of *this* case, Marad's counsel conceded that Marad had not raised "buyer in the ordinary course" in any of its previous pleadings. March 19, 1987 transcript at 5–6.

■■■■ At the conclusion of this hearing, while noting that Marad's failure to respond to the summary judgment motion *and* Marad's failure to respond in any fashion to the Banks' 13(h) statement constituted independent bases for granting the Banks' summary judgment,[20] Marad was given additional time to respond. However, because Marad failed to explain its delay in initiating discovery or demonstrate why further discovery was necessary, Marad's Rule 56(e) motion was denied. See, *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919 (2d Cir.1985).

Thereafter, Marad filed papers in opposition to the Banks' summary judgment motion and the Banks responded to Marad's cross-motion. Thus, by the April 6 hearing on the cross-motions, the issues were framed as follows: The Banks sought a determination that their blanket lien in the debtor's inventory and after acquired property was superior to the security interest in the Vessels asserted by Marad, as successor to ASI and Apollo. The debtor supported the Banks' position.

Marad sought a declaration that as a "buyer in the ordinary course" it *owned* the Vessels free of the Banks' security interest. Reduced to essentials, Marad argued that inasmuch as the Banks' security agreements authorized the debtor to sell inventory in the ordinary course, Apollo, ASI, and Marad, acting in good faith, became "buyers" when the Vessels were identified to the contracts. Third-party defendants IIC and HBN filed papers supporting Marad's position and opposing the Banks' motion.

The Banks' and the debtor responded by challenging Marad's eleventh hour attempt to raise "buyer in the ordinary course", a previously unasserted affirmative defense, in the guise of a summary judgment motion. Citing Rule 8(c) of the Federal Rules of Civil Procedure, as incorporated by Bankruptcy Rule 7008 and prevailing case law, the Banks' asserted that "buyer in the ordinary course" was an affirmative defense which, if not affirmatively pled in an answer, was waived. They argued that since Marad offered no other defense Marad's cross-motion should be denied and the Banks granted summary judgment.

Alternatively, the Banks argued that if Marad were permitted to assert buyer in the ordinary course status, the entry of the Rejection Order precluded that defense. According to this theory, the Rejection Order nullified the Apollo contracts extin-

---

**20.** Failure to file a 13(h) statement constitutes sufficient basis for denial of the motion. In addition, failure to respond is deemed an admission. Rule 13(h) is the mate to Local Rule 3(g) of our District Court. Failure to comply with that Rule has not only served as the basis for the denial of a summary judgment motion, but also as the basis for the imposition of sanctions against counsel. See, *I.P.S. Inc. v. Interglobal Video Division of Music Express Financial Corp.*, No. 86 Civ. 8019 (JFK) slip op. (S.D.N.Y. October 30, 1987) [Available on. WESTLAW, 1987 WL 19643].

guishing the debtor's remaining obligation to complete and deliver the Vessels and pass title to ASI.

The Banks also argued that if Marad were permitted to assert "buyer in the ordinary course" at this juncture, issues of fact were raised, precluding the grant of summary judgment. Thus, the Banks maintained that the priority granted "buyers in the ordinary course" was crafted to protect ordinary commercial purchasers of inventory and was not envisioned to govern the unique transaction at issue here. From this it was argued that the application of this defense to this unique transaction would raise a plethora of questions requiring the initiation of discovery, and ultimately, the resolution of questions of fact after a trial.[21]

On April 6, the cross-motions for summary judgment were argued. Marad, this time around, argued that "buyer in the ordinary course" was not new in the case, because it had been raised in Marad's Answer to the Complaint in the following language:

"8. The first sentence of paragraph 8 is denied but Marad and ASI admit that the Construction Contracts name Apollo Company L.P. as the *purchaser*.... The fourth sentence is denied except that it is admitted that ASI is now the *pur-*

*chaser* under the Construction Contracts.", and (ii) in Marad's November 20, 1986 Objection to the Letter Agreement. See, Tr. April 6, 1987 hearing at 13, 27.

Alternatively, Marad argued that the Banks were on notice that "buyer in the ordinary course" would be raised as a defense in the adversary proceeding by virtue of its November 1986 Objection to the Letter Agreement. Marad also argued that "buyer in the ordinary course" was not an affirmative defense within the contemplation of F.R.Civ.P. 8(c), and was not waived.

At the conclusion of this presentation, Marad's counsel made a surprise announcement tht it had *that day* filed a motion in accordance with F.R.Civ.P. 15(a) and Bankruptcy Rule 7015 to amend the Answer to assert "buyer in the ordinary course" as a defense. That motion was scheduled to be heard on June 5, 1987, nearly one month later. At this juncture, the summary judgment motions were marked submitted.

## VI. MARAD'S MOTION TO AMEND ITS ANSWER

Four months after the Banks' filed their summary judgment motion and one month after the cross-motions for summary judgment were submitted, Marad appeared to request leave to amend the Answer to include "buyer in the ordinary course" as a

---

**21.** It would appear that at least the following new legal and factual question were raised from Marad's belated assertion of "buyer in the ordinary course" ("BIOC"): (i) Whether or not a "sale" occurred for purposes of determining BIOC status. See, e.g., UCC § 2–401 which requires title to pass for a sale to take place. *Abbott v. Blackwelder Furniture Co.,* 33 B.R. 399 (W.D.N.C.1983); *Myers v. Dunlop Tire & Rubber Corp.,* 69 Misc.2d 729, 330 N.Y.S.2d 461 (Sup.Ct. 1972), *mod* 40 A.D.2d 599, 335 N.Y.S.2d 961 (1st Dep't 1972). Under this line of cases, Marad could not be a BIOC, since title had not passed. These cases should be compared with those granting BIOC status when goods are identified to the contract. See, e.g., UCC § 2–501; *Puget Sound Nat. Bank v. Honeywell, Inc.,* 40 Wash. App. 313; 698 P.2d 584 (1985); *Servbest Foods, Inc. v. Emessee Industries, Inc.,* 82 Ill.App.3d 662, 403 N.E.2d 1 (Ill.1980); *In re Darling's Homes, Inc.,* 46 B.R. 370 (Bankr.D.Del.1985); (ii) Was the debtor in the business of selling "incineration vessels" as required under UCC § 1–201(9) for Marad to be a BIOC?; (iii) Whether Marad, as *successor* to ASI, could as-

sert BIOC status under the UCC § 9–307 where *Apollo* was the actual purchaser of the Vessels, or does a BIOC only take free of a security interest created by its immediate seller? See, *Lindsley v. Financial Collection Agencies, Inc.,* 97 Misc.2d 263, 410 N.Y.S.2d 1002 (Sup.Ct.1978); (iv) Whether Marad could satisfy the "good faith" element that is a prerequisite to BIOC status under UCC § 1–201; (v) Whether the entry of the Rejection Order before completion of the Vessels and passage of title precluded Marad from asserting BIOC status. *See, Lubrizol Enterprises v. Richmond Metal Finishers,* 756 F.2d 1043, 1048 (4th Cir.1985), where the court stated that the party to the rejected contract "could not seek to retain its contract rights in the technology by specific performance even if that remedy would ordinarily be available upon breach of this type of contract ... § 365(g) makes clear that the purpose of the provision is to provide only a damages remedy for the non-bankrupt party."; *In re Executive Technology Data Systems,* 79 B.R. 276, 16 B.C.D. 766 (Bankr.E.D. Mich.1987).

third defense. In turn, because "buyer in the ordinary course" served as the cornerstone of Marad's opposition to the Banks' summary judgment motion, Marad, by this posturing, also reargued the *sub judice* summary judgment motions.

In this round, Marad asserted that it should not be required to earmark "buyer in the ordinary course" as a defense since it was pled in the Answer as a denial of the priority of the Banks' lien in accordance with Rule 8 of the Federal Rules of Civil Procedure and Bankruptcy Rule 7008. Alternatively, Marad sought permission to amend the Answer pursuant to F.R.Civ.P. 15(a) and Bankruptcy Rule 7015 to carry "buyer in the ordinary course" as a defense. For all the reasons set forth below, Marad's motion was denied.

### A. *"Buyer in the Ordinary Course" is an Affirmative Defense*

Marad's first argument was that it was not required to amend the Answer because "buyer in the ordinary course", was already pled as a general denial of the priority of the Banks' lien. This argument was bolstered by Marad's assertion that its November, 1986 Objection to the Letter Agreement, filed in connection with the debtor's bankruptcy case, should have put the parties on notice that "buyer in the ordinary course" would be raised by Marad as a defense in the adversary proceeding.

■ Marad's characterization of "buyer in the ordinary course" as a denial under F.R.Civ.P. 8(b) is mistaken. A denial under Rule 8(b) simply controverts the elements of the opposing party's prima facie case. However, to assert that one is a buyer in the ordinary course does more than deny an element of the case in chief—it raises new matter outside the scope of plaintiff's prima facie case. Such an allegation falls within the confines of Rule 8(c) and must be affirmatively alleged. *See,* 2A *Moore's Federal Practice* par. 8.27[3] (2d ed. 1986).

■ While Rule 8(c), for ease of application, delineates nineteen affirmative defenses, it also clearly states that the list is not exclusive—leaving room for a review of pleadings on a case by case basis. The determination as to whether a defense not enumerated in Rule 8(c) must be pled affirmatively is generally determined by looking to which party bears the burden of proof under State law. Where a party bears the burden of proof on an issue under state law, and that party asserts that defense in federal court, the burden of proof remains with that party and that defense must be pled affirmatively in the answer. *See,* 2A *Moore's Federal Practice* par. 8.27 (2d ed. 1986). Under the UCC, it is the burden of the party asserting "buyer in the ordinary course" status to prove that it is entitled to such status. *See, In re Gary Aircraft,* 681 F.2d 365 (5th Cir.1982); *In re Air Vermont, Inc.,* 44 B.R. 433 (Bankr.Vt.1984).

■ In making the determination as to whether a defense must be affirmatively alleged, the courts must also be guided by the policy of the Federal Rules, as embodied in Rule 1 and Bankruptcy Rule 1001, mandating that the rules "be construed to secure the just, speedy, and inexpensive determination of every action." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). To that end, an objective of Rule 8(c) is to insure that there be no surprise on the eve of trial by the assertion of a defense raising extraneous and unexplored matters. *See Crowe v. Cherokee Wonderland, Inc.,* 379 F.2d 51 (4th Cir.1967). Here, the Banks were faced with just such surprise when Marad raised "buyer in the ordinary course" as a defense to the summary judgment motion. Marad's argument that the Objection to the Letter Agreement, a document filed in a matter separate and apart from this adversary proceeding somehow assuaged that surprise, must be rejected on its face.

Other courts have also viewed buyer in the ordinary course as a Rule 8(c) affirmative defense. *See ITT v. International Credit Company,* 525 F.Supp. 170, 172 (E.D.Mo.1981); *In re Morristown Lincoln Mercury, Inc.,* 25 B.R. 377, 383 at n. 6 (Bankr.E.D.Tenn.1982); *Johnson & Kirby, Inc., v. National Bank of Ft. Lauderdale,* 338 So.2d 905, 906 (Fla.App.1976). *See*

*also Natural Resources, Inc. v. Wineberg,* 349 F.2d 685, 688 at n. 3 (9th Cir.1965), where the court determined that "bona fide purchaser" was an affirmative defense.

■ Having determined that buyer in the ordinary course is an affirmative defense, the law of this Circuit is that an affirmative defense must be affirmatively alleged in the answer. Failure to do so constitutes a waiver. *Davis v. Bryan,* 810 F.2d 42 (2d Cir.1987); *Satchell v. Dilworth,* 745 F.2d 781 (2d Cir.1984); *Evans v. Syracuse City School District,* 704 F.2d 44 (2d Cir.1983). It is also clear that an affirmative defense must be raised in an answer at the earliest possible moment. *Strauss v. Douglas Aircraft Co.,* 404 F.2d 1152 (2d Cir.1968).

### B. *Marad's motion to amend was properly denied*

■ Rule 15(a) of the Federal Rules of Civil Procedure, and Bankruptcy Rule 7015, govern amendment of pleadings, providing that "leave shall be freely granted when justice so requires". However, freedom to amend is not without limit. "Undue delay, bad faith, futility of the amendment, and perhaps, most importantly, the resulting prejudice to the opposing party" constitute sufficient cause to limit that freedom. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1963). And, while the cases are clear that delay alone would not suffice as cause for denial of a motion to amend, they are also clear that when accompanied by prejudice, denial is warranted. *Ansam Associates, Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442 (2d Cir. 1985); *Barrows v. Forest Laboratories, Inc.,* 742 F.2d 54 (2d Cir.1984); *See also, Richardson Greenshields Securities, Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987).

As detailed herein, the record is replete with Marad's unexplained dilatory tactics—with no compelling reason offered for the delay. These tactics resulted in "the last minute surprise and inability of opposing counsel to meet the tendered issue" denounced by Rule 8(c). *Evans v. Syracuse City School Dist.,* 704 F.2d at 47.

In addition, by raising buyer in the ordinary course at the eleventh hour, the previously defined theories of relief were substantially altered, requiring the *initiation* of discovery. See footnote 21 *supra,* for a detailed discussion of the plethora of legal and factual issues raised by this defense. As discussed below, other courts faced with similar circumstances have also found prejudice.

In *Ansam Associates,* 760 F.2d 442, a case presenting similar facts to those at hand, the Second Circuit affirmed Judge Bartels denial of leave to amend a complaint eleven months after the action was commenced, after discovery was completed and after the submission of a summary judgment motion, as follows:

> We agree with Judge Bartels that "[t]he proposed fraud claims allege an entirely new set of operative facts of which it cannot be said that the original complaint provided fair notice." Moreover, permitting the proposed amendment would have been especially prejudicial given the fact that discovery had already been completed and Cola had already filed a motion for summary judgment.

760 F.2d at 444; *See also, Barrows v. Forest Laboratories, Inc., supra;* (affirmance of the District Court's denial of a motion to amend, over two years after the action was commenced, where claims would substantially alter theories and significantly expand the scope of discovery); *Roberts v. Arizona Board of Regents,* 661 F.2d 796 (9th Cir.1981) (denial of motion to amend two years after the action was commenced, after discovery was completed and the summary judgment motion submitted).

## VII. THE SUMMARY JUDGMENT MOTIONS

With Marad's machinations serving as a backdrop, we reach the merits of the summary judgment motions which must be decided only within the purview of the filed pleadings and rulings set forth above. In this framework, as was the case from the day the Complaint was filed, the motions simply require a determination, guided by the Uniform Commercial Code, as to the priority of competing liens. This is so be-

cause Marad's Answer and responsive papers—bereft of buyer in the ordinary course—does not raise any other defense that would defeat the Banks' lien.

Marad's cross-motion for summary judgment must be denied because it is exclusively based upon Marad's assertion of "buyer in the ordinary course" status—an affirmative defense Marad is barred from raising.[22]

### A. The standards for summary judgment

 Summary judgment, as embodied in F.R.Civ.P. 56, serves as a tool to facilitate the expeditious administration of justice, allowing the court to smoke out those cases not requiring trial. *S.E.C. v. Research Automation Corp.*, 585 F.2d 31 (2d Cir.1978). It is the moving party's burden to demonstrate the absence of a genuine issue as to the facts material to the litigation. This court has carefully scrutinized all materials submitted by the parties in light of Judge Kaufman's recent reminder that

> "The fundamental obligation of the federal courts is to adjudicate disputes. Not all controversies present triable issues, however, and the courts have a responsibility to vigilantly weed out those cases that do not merit further judicial attention. The procedural tool of summary judgment enables courts to terminate meritless claims, but this potent instrument must be used with the precision of a scalpel. The courts must take care not to abort a genuine factual dispute prematurely and thus deprive a litigant of his day in court."

---

**22.** Of course, even if Marad could assert "buyer in the ordinary course" status, that defense raises issues of fact, precluding the grant of summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). See fn. 21, *infra.*

**23.** While, as more fully explained in Section VII, *infra,* third-party defendants belatedly sought to raise the effect of the April 12, 1985 issuance of a Certificate of Documentation for Apollo One naming ASI as the owner of that Vessel, the following bears noting (i) it would appear that under Title 46 of the United States and caselaw, the issuance of a Certificate of

*John C. Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54 (2d Cir.1987).

Bearing this reminder in mind, however, a review of the record before me clearly indicates that the only issues raised are legal and they may be resolved without the necessity of a trial. The Banks are entitled to the grant of summary judgment on the Complaint because the Uniform Commercial Code dictates that the Banks' previously filed security interest in the Vessels has priority over ASI's (and Marad's) security interest.

### B. The Banks' have a "first in time" perfected security interest in the Vessels

 Section 9–203 of the UCC sets forth the following four elements that must be met for a security interest to attach and be enforceable: (1) the debtor must sign a security agreement; (2) the security agreement must describe the collateral; (3) the secured party must give value; and (4) the debtor must have rights in the collateral. The Banks' security interest meets each of these requirements. The debtor signed the 1980 Security Agreement. The Security Agreement clearly describes the collateral subject to the Banks' lien, which encompasses the Vessels. The Banks gave value by making loans and other financial accommodations to the debtor in excess of $32,000,000. Finally, the debtor holds title to the Vessels, thereby satisfying the fourth element.[23]

In addition, in accordance with UCC § 9–401, the Banks perfected their security

---

Documentation is not conclusive as to ownership of a vessel, but rather, courts are guided by the underlying contract. *Jones v. One Fifty Foot Gulfstar*, 625 F.2d 44 (5th Cir.1980); (ii) inasmuch as the Apollo contracts were subsequently rejected in accordance with § 365 of the Code without ASI or Marad raising the purported transfer of title effectuated by the issuance of the Certificate, those parties are now estopped from raising this argument. Also, as explained in footnote 21, the rejection of the contracts precludes Marad's assertion of any right arising under the contracts, leaving only a claim for damages.

interest in September 1980 by filing a UCC–1 financing statement with the Washington Department of Licensing. The Banks continued the perfection of their security interest by filing a UCC–3 continuation statement on June 24, 1985. Accordingly, the Banks have held a perfected security interest at all times since September 18, 1980.

Marad's security interest is derived from ASI and Apollo, its predecessors. However, while Tacoma granted Apollo a security interest in the Vessels in December, 1981, that security interest was not perfected until October 20, 1982, when Apollo filed its financing statement. Thus, both parties allege perfected security interests in the Vessels.

Section 9–312 of the UCC governs priorities among conflicting liens in the same collateral, giving a "first in time" perfected security interest priority over one that is later perfected, as follows:

§ 9–312. Priorities Among Conflicting Security Interests in the Same Collateral

(5) In all cases not governed by other rules stated in this section, priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

Thus, inasmuch as the Banks' security interest was perfected more than two years before Apollo's, Apollo's security interest (and Marad's) is subordinate to that of the Banks.[24]

## VIII. POST–SCRIPT—THE CLOCK STRIKES THIRTEEN

■ While it was assumed that it was made clear to the parties to this proceeding

that this Court would not countenance the eleventh hour dilatory tactics pursued by Marad in contravention of the clear dictates of the Federal Rules, this was not to be the case. In August, 1987, six months after the summary judgment motions (and thousands of pages of supporting documents) were filed and four months after they were taken under advisement, third-party defendant IIC, supported by third-party defendant HBN, filed a motion which could only serve to further delay and complicate this proceeding—"like the thirteenth stroke of a clock, which raises serious doubts as to the reliability of the first twelve strokes." See, *In re United Merchants and Manufacturers*, 3 B.R. 286, 299 (Bankr.S.D.N.Y.1980).

This motion sought to supplement the record to include the following *newly* discovered documents (i) the Certificate of Documentation (the "Certificate") dated April 12, 1985, issued by the United States Coast Guard pursuant to 46 U.S.C. § 65w identifying ASI as the owner of Apollo One; (ii) Application submitted by A.S.I. in conjunction with the request for the Certificate; and (iii) a related Builder's Certificate. Third–party defendants also sought to file their own Rule 13(h) statements and supplemental memoranda of law to explore the following unexplored legal theories suggested by these documents—(i) that the Banks' summary judgment motion should be denied and Marad awarded possession of Apollo One because under federal law the issuance of the Certificate operated to invalidate the Banks' lien in the Vessels. *See*, 46 U.S.C. § 921, UCC §§ 9–104, 302(3) and (4); (ii) that the Banks' summary judgment motion should be denied and Marad awarded possession of Apollo One and Two, because there was a sale of the Vessels authorized by the terms of the Banks' security agreement or because Apollo was a "buyer in the ordinary course". *See*, UCC §§ 9–302, 307(1).

IIC's singular justification for originally *supporting* Marad's cross-motion and for

---

**24.** While UCC §§ 9–107 and 9–312 sets forth the requirements for the creation of a purchase money security interest with the ability to prime

a previously perfected lien, Apollo did not avail itself of this protection.

not "discovering" these documents earlier was that it had not instructed local counsel to conduct an in depth analysis of the merits of the competing claims to the Vessels until the debtor later filed an objection in accordance with § 502 of the Code to IIC's Proof of Claim. See Affidavit of Benjamin D. Lentz annexed to IIC's August 21, 1987 Notice of Motion. HBN did not offer any excuse for its indolence.

Suffice it to say that in the same fashion Marad belatedly sought discovery of publicly filed documents evidencing the Banks' security interest, the "new" documents suddenly discovered by third-party defendants were not new at all—having been specifically referred to in paragraph 12 of the Banks' November 1985 Complaint. *See* footnote 2. The Banks noted this in their responsive papers, but because the Certificate was already part of the record, they did not oppose that prong of the motion. Thus, the summary judgment motions were decided in light of the expanded record and the issues raised in timely filed pleadings.

However, while it would appear that third-party defendants' revised analysis presents interesting legal questions, they were not raised in a proper or timely fashion by any party and are not part of the record before me. To the extent third-party defendants belatedly sought to raise the issuance of the Certificate as an affirmative defense to the Banks' Complaint, the same pleading requirements warranting denial of Marad's [25] motion, compelled denial of this motion, and it was so ruled. Indeed, if possible, third-party defendants demonstrated even less excuse for their delay. *See, Mawhinney v. Heckler,* 600 F.Supp. 783 (D.Maine 1985).

Accordingly, it is hereby found and determined that:

1) The Banks' have a "first in time" perfected security interest in the Vessels, which primes Marad's security interest;

2) For all the reasons set forth herein, the Banks' summary judgment motion is granted and Marad's cross-motion for summary judgment is denied.

It is SO ORDERED.

---

**25.** Indeed, why Marad, an entity rooted in the law of the seas chose not to raise the substantial admiralty issues raised by third-party defendants as an afterthought will remain one of the great unsolved mysteries.